Gill, &c. v. Fugate, &c.

CASE 29—ACTION BY SETH W. GILL, &C. AGAINST M. L. FUGATE, &C.
FOR A NEW TRIAL.—JAN. 12.

# Gill, &c. v. Fugate, &c.

### APPEAL FROM LOGAN CIRCUIT COURT.

JUDGMENT FOR DEFENDANTS AND PLAINTIFFS APPEAL.    REVERSED.

FRAUD—INNOCENT PARTIES—ESTOPPEL—FORECLOSURE OF VENDOR'S
LIEN—DEFENSE UNAVOIDABLE CASUALTY—NEW TRIAL.

Held:  1. After delivery of a deed the grantee included therein
land not sold, and then conveyed it without consideration, taking
back purchase-money notes, which he assigned as collateral
to a bank.  HELD that, the second grantee being only a volun-
teer, and the notes being non-negotiable, and therefore, under
Kentucky Statutes, 1903, sections 474-483, subject to all defenses
in the hands of an assignee that they would have been in the
hands of the payee, there was no innocent party to prevent re-
lief from the deed.

2. Where G. sold certain land to W., and W., after delivery of the
deed, included other land therein, and then made a voluntary
conveyance of all of it to S., taking back purchase-money notes,
which he assigned to a bank, the bank not examining the rec-
ords, but taking the word of W. as to the title, there is noth-
ing to estop G. from having relief from the deed.

3. G. sold land to W., taking back purchase-money notes.  After the
deed was delivered, W. included therein other lands of G.  The
notes were sent by G., who lived eighteen miles from the county
seat, to his attorneys to collect, they being referred to the rec-
ords for the description of the land.  They foreclosed the lien
on all the land included in the deed, there being no reason for
consulting G., so that he did not learn till after the trial of
the change in the deed.  HELD, that he was entitled to a new
trial under Civ. Code, section 518, subsec. 7, for unavoidable
casualty preventing his appearing.

4. The purchaser at decretal sale in a suit to foreclose the lien of
a purchase-money note, having paid nothing, and having bought
at a price entitling the owner to redeem, may not prevent a

new trial on discovery that land was fraudulently included in the deed.

W. P. SANDIDGE, FOR APPELLANTS.  BROWDER & BROWDER, FOR APPELLEES.
    (No briefs.)

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

S. H. Gill owned a farm of about 236 4-5 acres of land in Logan county at his death.  He died intestate.  There survived his widow and three children, viz., Seth W. Gill, Mary B. Young, and Dovie Wilson, who were his only heirs at law.  The land was partitioned among them by mutual conveyances as follows:  The widow was allotted 76 acres as dower.  To the son, Seth W. Gill, was allotted 40 1-2 acres; to Mary B. Young 57 1-2 acres, and to Dovie Wilson three tracts—one of 44 acres, another of 11 acres, and the other, 7 4-5 acres.

The subjoined plat shows the situation, and will enable the other facts of the case to be more easily understood:

Dovie had married H. S. Wilson, who had been an at-

torney at law.    In 1888 Seth W. Gill conveyed to H. S.
Wilson, by deed, his 40 1-2 acres, and his undivided one-
third in the dower tract, subject to the widow's life.    Mrs.
Young at the same time conveyed to H. S. Wilson her 57 1-2
acres and her one-third of the dower tract.    Part of the pur-
chase money was unpaid, and liens were retained in each of
the deeds.    Thereafter the widow died, and in a short while
after her death, Mrs. Dovie Wilson died intestate, without
having had a child born alive.    In consequence Seth. W.
Gill and Mary B. Young, as heirs at law, inherited the three
tracts allotted to Dovie Wilson (the 44 acres, 11 acres, and
7 4-5 acres), as well as her one-third of the dower tract.    At
the instance of H. S. Wilson, Mrs. Young and her husband
and Seth W. Gill went to his house some time after the
the death of his wife, where he proposed to buy from them
their interest in the dower tract, as they now claim.    The
negotiation resulted in a sale of the interest mentioned for
$800, represented by two notes of $400 each, executed to
the vendors, respectively, by H. S. Wilson.    The deed exe-
cuted in pursuance to that sale is dated in 1898.    This is
the transaction principally involved in this suit.    As stated,
the vendors claim and testify that they intended to sell only
the one-third of the dower inherited from their deceased sis-
ter; that no proposition was made to them to sell any other
land; nor did they know that they had the title to the other
lands formerly allotted to Mrs. Dovie Wilson.    It may be
here remarked that these two persons seem to have been
simple people, and very ignorant of their legal rights, as well
as without much knowledge or intelligence concerning such
transactions.    H. S. Wilson prepared the deed, which they
say Seth W. Gill read aloud in the presence of the others.

The grantors some days later carried the deed to a
deputy county court clerk living in the neighborhood, and,

without re-reading it, signed and acknowledged it. The deputy clerk indorsed the acknowledgments on the deed, and it was delivered to H. S. Wilson. Seth W. Gill and Mrs. Young each testify that the deed only recited a sale of their one-third interest in the dower tract. The deputy clerk, who knew the land and the parties, testified that he remembered the transaction, and that the deed mentioned only the dower interest. The original deed is not produced, but the certified copy from the record of deeds in the county clerk's office shows that a tract of land by metes and bounds was conveyed, including every foot of the 236 4-5 acres except the 11 acres. It is charged in this suit by appellants, Seth W. Gill and Mary B. Young, that the deed as recorded was procured by the fraud of H. S. Wilson.

A year or so after the last named deed was executed H. S. Wilson conveyed all the land mentioned to his father, S. A. Wilson, then and now a resident of the State of Tennessee. The recited consideration for the conveyance (which included all the personal property on the farm) was $5,500, evidenced by four notes executed by S. A. Wilson to H. S. Wilson for $1,375 each, payable in one, two, three and four years, respectively. These notes H. S. Wilson assigned to certain of his creditors to secure antecedent debts, and borrowed also about $900 additional on them, and procured the release of about $1,500 of collateral from one of his creditors, the People's Bank of Adairville. He then became a bankrupt, and has left the State. Seth W. Gill sent his notes to an attorney at Russellville to bring suit enforcing a lien in his favor on the land he had sold to H. S. Wilson. Mrs. Young sent her notes to an attorney at the same place for like purpose. The attorneys, not knowing what lands had been conveyed, and being referred by their clients to the

county court records for proper descriptions, and the clients being ignorant of the fact that the deeds contained any reference to any but the lands actually sold, having no reason to suspect otherwise, the suits were brought in their names by their attorneys to enforce their liens on all the lands referred to in their deeds.    The People's Bank of Adairville, as holder of three of the $1,375 notes executed by S. A. Wilson to H. S. Wilson and by him assigned to the bank and C. E. Haddox, the assignee of the other $1,375 note, were made parties to the proceedings, and set up their notes and liens.    A judgment was rendered, by consent of all the lienholders, through their attorneys, enforcing the liens on all the land comprising the 236 3-4 acres, including the 11 acres, which no one claimed had been conveyed at all since Mrs. Dovie Wilson's death.    At the sale made under this decree appellee M. L. Fugate, who was cashier of the People's Bank of Adairville, became the purchaser of the whole tract for $2,750.    It was appraised at $5,328.

This suit was brought by appellants, Seth W. Gill and Mary B. Young, to obtain a new trial of the action last mentioned.    In addition to the facts above stated, it is alleged that the judgment was rendered decreeing a sale of their lands, viz., the 44 acres, 11 acres, and 7 4-5 acres inherited from their sister, to satisfy debts of S. A. Wilson and H. S. Wilson, and by casualty and misfortune they were prevented from appearing and showing that fact in the original suits.    The learned judge who tried this case has advised us by an opinion filed in the court below of his conclusions of law as well as the finding of the facts upon which he based his judgment refusing the new trial.

It is contended for appellees here that the transaction between H. S. Wilson and appellants shown by the deed of

1898 was not fraudulent.     No witness testified upon that
branch of the case save appellants and the deputy clerk who
took their acknowledgments.     An ingenious argument is
made by appellees' counsel in support of his theory.     But
the facts will not be reconciled with it.     The trial judge
was moved to remark:     "I am convinced from the proof in
this case that S. W. Gill and Mrs. Young were the innocent
victims in the hands of an unscrupulous scoundrel, who would
not have hesitated to rob them of their patrimony in their
ancestor's estate, and did to a very great extent do so.
.  .  .  In his last deal with them he procures a conveyance
from them investing him with the entire interest derived by
his said wife from her father's estate practically for a nomi-
nal consideration.     I do not think in my practice I am cog-
nizant of a case which so strongly appealed for the interven-
tion of a chancellor to redress the outrageous wrong as the
case at bar, and I would take pleasure in granting the re-
lief prayed for if it couldd be done without making the inno-
cent suffer who is free from fault or neglect."     The inno-
cent referred to in the chancellor's opinion, and whose interest
and attitude arrested his arm, is the People's Bank of Adair-
ville.     As stated, the bank was a creditor of H. S. Wilson
for about $1,500 secured by collateral notes.     This collateral
was surrendered, and $900 additional loaned on the three
$1,375 purchase money notes of S. A. Wilson, above alluded
to.     It was the view of the chancellor that the bank was
an innocent holder for value of these notes, which had been
executed for a conveyance of a title shown by the proper rec-
ords to be apparently vested in the grantor; that, as between
it and appellants, who had been defrauded of their lands
by another, it should be protected.     This brings us to con-
sider what was the relation of these parties to the real sub-

ject-matter of the suit, to wit, the land. Under the findings
of the chancellor the land had not been bargained, nor had
it been intended by appellants to convey them. They were
included in the deed by mistake, or by the fraud of H. S.
Wilson, according to all the proof in the record. Appellants
could have sued immediately to have had that conveyance
corrected. If H. S. Wilson conveyed the land to another
with notice of his fraud or of the mistake, or if he conveyed
it to such other without valuable consideration, the title
would have been liable in the hands of such grantee to the
same relief at the instance of appellants as if it remained
in H. S. Wilson. Now, the allegation was—and we think
the record sustains it—that H. S. Wilson executed this con-
veyance to defraud his creditors; that if it was in reality a
voluntary conveyance to his father to defeat his (H. S. Wil-
son's) creditors. Appellants were of his creditors. That
being true, the conveyance was void, in so far as appellants
were creditors. In no event was it an obstacle to their re-
covering their own as against the volunteer, S. A. Wilson.
The latter merely assumed the place of his son, H. S. Wil-
son, as holder of his title, for whomsoever might have the
right to reclaim it from said H. S. Wilson. The notes exe-
cuted by S. A. Wilson to H. S. Wilson were not negotiable.

By our statute (sections 474-483, Ky. St., 1903) they
were subject to every defense in the hands of an assignee
that they would have been in the hands of the original
payee. Therefore, when the bank took these notes, whether
for value or not, it merely took H. S. Wilson's title to them
—took his place as payee. It could have no greater or other
rights growing out of them, except as against H. S. Wilson,
than he had. The bank, as holder of these notes, being in
H. S. Wilson's place, could not have interposed them as a de-

fense to the suit of appellants to recover of H. S. Wilson the land of which he had defrauded them. S. A. Wilson could not have been compelled by the bank to pay the notes. H. S. Wilson, by assigning the notes, the fruits of his fraud upon appellants, could not create a valid title in his assignee to the estate represented by them. What would have been the situation had H. S. Wilson, with an apparent title of record, sold and conveyed the land for value to an innocent purchaser, or had mortaged it to an innocent creditor, we need not stop to consider. That is not this case. As non-negotiable notes the bank took them *cum onere*. It will not be relieved by suggesting that it might have got a good title from the same person in some other way. Nor is this a case of estoppel. It is not claimed nor shown that the bank was misled by the state of the record of deeds, nor that it examined or relied on the record. Appellants made no representations by which the bank was induced to alter its condition. It acted alone on H. S. Wilson's representations, and relied on its faith in his apparent title to the paper as an evidence of an enforceable debt owned by him against the land. Unfortunately, his title was not good. The paper did not give him an enforceable lien on the land. It was not enforceable for any purpose. It was worthless. His assignee must therefore lose.

It is very earnestly argued that under section 518, Civil Code, subsection 7, the new trial was not authorized, for it was under that section that it was sought. It reads: "The court in which a judgment has been rendered shall have power, after the expiration of the term, to vacate or modify it. . . . (7) for unavoidable casualty or misfortune preventing the party from appearing or defending." It is claimed that there was no misfortune that prevented appellants

from appearing.    They are not defending.    Appellants were not aware that their deed contained the description it did. Having no thought of that kind, and nothing to suggest it to them, it was not reasonable that they would or should make inquiry, or examine the records to discover the truth of it.    They lived some eighteen miles from their county seat, Russellville.    They sent their notes by mail to their attorneys for collection.    This was not an unusual or negligent method of transmitting them.    It was not probable that they would have copies of the description of the land at hand.    They were contained in the deeds of record.    Supposing, naturally, that the record showed the truth, it was not improper to merely refer the attorneys to the records to get the necessary boundary descriptions to be set out in the petition to enforce their liens.    The attorneys, not being told, and nothing appearing to excite inquiry, supposed, of course, that the deeds to which they had been referred by their clients were genuine, and brought the suits accordingly.

The suits, being based upon writings filed therewith, were not required to be verified or signed by the plaintiffs.    There was no issue of fact presented in the case, and consequently no reason for calling the clients for consultation before the trial. They took the usual and formal course.    No negligence appears, for negligence implies a failure to do something which duty or prudence requires should have been done.    The combination of probabilities, of every reasonable appearance that would mislead an ordinarily careful and prudent person pursuing that business, was such as to produce the mistake in the trial of the lien suits enforcing a lien on land not sold by the plaintiffs, for debts for which it was in no wise liable.    This was the result of a "casualty"—an unforeseen incident—a misfortune.

The case of Denny v. Wickliffe, 1 Metc., 216, is relied on by appellees. There the plaintiffs sought a specific execution of a contract of sale. The defense was that he had not paid all the purchase money. After the judgment plaintiff sought a new trial on the ground that he had since discovered that the title was defective. The court held that as a purchaser the law presumed him constructively notified of the state of his title shown by the record, and that the record was open to him for inspection; that it was natural and usual for purchasers to investigate the records concerning the title they are buying. That is what the records are for, principally. But here the vendor is not called upon by any sort of ordinary prudence to examine the records to see if his deed had been tampered with since it left his hands, nothing having occurred to arouse his suspicion about the matter.

In Elliott v. Harris, 81 Ky., 470, 5 R., 499, Mrs Elliott, the holder of the purchase money lien notes against land, in a suit to enforce them lost because of an apparent failure of title in the vendor. After the judgment she accidentally discovered the deed of record constituting the missing link. In her action for a new trial it was urged, as here, that she must take notice of the records. This court held that, as the deed, though recorded, was not indexed, it was not a lack of diligence not to find it. See, also, Hall v. Com. (17 R., 231), 30 S. W., 877.

The facts stated were held to constitute casualty or misfortune entitling the losing party to a new trial. The purchaser at the decretal sale had paid nothing; had bought at a price entitling the owner to redeem—a price at which the sale might have been set aside for inadequacy, if any other casualty or error in the proceedings, even slight. The

circuit court should have set aside the judgment and proceedings thereunder, and have awarded the new trial.

Judgment reversed, and cause remanded for proceedings consistent herewith.

Petition for re-hearing for appellee overruled.